WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Megan Ashlie Borges,<br><br>Defendant. | CR-18-01695-006-TUC-JAS (EJM)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is a Motion to Suppress All Evidence and Statements for Fourth Amendment Violations filed by the defendant Megan Ashlie Borges ("Borges"). (Doc. 770.)  Specifically, the defendant seeks the suppression of evidence seized from her home and statements made after her arrest for the following reasons: (1) the officers violated the knock-and-announce rule by failing to knock and announce their presence before forcibly entering her home; and (2) Federal Rule of Criminal Procedure 41 was violated because law enforcement officers did not have judicial authorization to enter her house to execute the arrest warrant during nighttime hours.  Because of the illegal entry into her home, the defendant argues that evidence obtained pursuant to a search warrant, which was premised on items seen in plain view during a protective sweep on the home, and the statements she made after her arrest should be suppressed as fruit of the poisonous tree.  *See Id.*

The government argues that the arrest warrant provided law enforcement with authority to enter the defendant's home at any time to effectuate her arrest.  The

1   government also argues that an exigency required them to enter the defendant's home prior

2   to knocking and announcing their presence.   Because the entry into the home was lawful,

3   neither the evidence seized pursuant to the search warrant nor the defendant's statements

4   are fruit of the poisonous tree.   *See* Doc. 891.

5          As discussed below, the Court finds that suppression of evidence obtained pursuant

6   to the search warrant or the defendant's statements is not an appropriate remedy even if the

7   knock-and-announce rule was violated.   The Court further finds that suppression of

8   evidence and statements is not warranted even if Rule 41 was violated by the nighttime

9   entry into the defendant's home to make the arrest.   Therefore, the Court recommends that

10  the District Court deny the Motion to Suppress.

11                           **FACTUAL BACKGROUND**

12         The defendant is charged with eighteen other individuals in a Second Superseding

13  Indictment with the offenses stemming from her alleged association with a violent street

14  gang called the Western Hills Bloods.   The offenses alleged against the defendant are as

15  follows: (1) a RICO conspiracy, the objects of which were murder, violent acts, drug

16  trafficking, and obstruction of justice (Count One); (2) Violent Crime in Aid of

17  Racketeering – Conspiracy to Commit Murder (Count Two); (3) Violent Crime in Aid of

18  Racketeering – Murder (Count Three); (4) Use of a Firearm During and in Relation to a

19  Crime of Violence Resulting in Death (Count Four); (5) Accessory After the Fact (Count

20  Seven); (6) Two Counts of Possession of a Firearm in Furtherance of a Drug Trafficking

21  Crime (Counts Eleven and Nineteen); (7) Possession of a Firearm by a Prohibited Person

22  (Count Eighteen); (8) Conspiracy to Possess with the Intent to Distribute Cocaine (Count

23  Twenty-Four); (9) Two Counts of Possession with the Intent to Distribute Heroin (Counts

24  Thirty and Thirty-Nine); (10) two counts of Possession with the Intent to Distribute

25  Cocaine (Counts Thirty-One, Thirty-Eight, and Forty-Three); (11) Possession with the

26  Intent to Distribute Fentanyl (Count Forty-One); and (12) Possession with the Intent to

27  Distribute Alprazolam (Count Forty-Two).   *See* Doc. 811.[1]

28  _____
[1] A Third Superseding Indictment was returned on April 6, 2022, which did not add charges
or defendants.  As such, the Court refers to the indictment pending at the time the instant

On September 22, 2021, the defendant filed the instant Motion to Suppress based on the grounds noted above and discussed below – *i.e.*, a violation of the knock-and-announce rule and a violation of Rule 41 by entering her home during nighttime hours without judicial authorization to do so.   On February 22, 2022, the Court held an evidentiary hearing on the Motion to Suppress.[2]   The government called three witnesses: (1) ATF Special Agent Robert Redd; (2) ATF Special Agent Samuel Katz; and (3) ATF Special Agent Paul Parkinson.  (Tr. 2/22/22 at 2.)   A summary of their testimony follows.

1.      **Special Agent Robert Redd**

   a.      **Direct Examination**

Agent Redd has been a Special Agent with the Department of Alcohol, Tobacco, Firearms and Explosives since 1994.  *Id.* at 5.  He is assigned to the Special Response Team ("SRT"), "which is like the SWAT team for ATF."  *Id.* at 6.    Agent Redd is the tactical commander for SRT 2, which covers primarily the northeast United States.  *Id.*   He is responsible for training, overseeing operations, and all facets of the tactical portion of the team.  *Id.*

Agent Redd was deployed to Tucson, Arizona shortly before August 30, 2018 to assist in arresting the defendant pursuant to a federal arrest warrant.  *Id.*  He explained that after SRT 3 was briefed on the planned execution of the arrest warrant, they realized they needed assistance from SRT 2.  *Id.* at 7.   The SRT's were advised that the defendant is an associate or member of the Western Hills Bloods and were provided with information on her criminal history and the federal charges, which included her involvement in setting up a homicide.  *Id.* at 8.   The SRT's were also advised about the possibility of firearms being present in the defendant's residence.  *Id.*  Specifically, they were told that the Western Hills Bloods is a violent organization that was involved in drug trafficking, violence, and the use of firearms.  *Id.*   The SRT's were also told that the defendant had a live-in boyfriend who

motion was filed.

[2] The delay in setting the evidentiary hearing stemmed, in large part, from the defendant's request for a lengthy extension of time to file her reply brief because of additional disclosure requested from the government.

1    was a member of the Western Hills Bloods and had a criminal history which included
2    aggravated assault on a police officer. *Id.* at 9.

3            Agent Redd testified that substantial planning occurred prior to the execution of the
4    arrest warrant. *Id.*   For instance, surveillance was done on the residence that SRT agents
5    would enter to determine if there were security doors, bars on windows, fences, or dogs.
6    *Id.* at 10.   Also "[p]attern of life surveillance [was] set up to determine who comes and
7    goes and when from the residence" so agents can "get a feel for who's going to be at the
8    residence at what times."   *Id.* at 10-11.    Surveillance is done so agents can plan
9    appropriately to keep everyone – *i.e.*, the public, the defendant, and the agents – safe.  *Id.*
10   at 11.

11           There were a couple reasons why the arrest was planned at the defendant's home.
12   *Id.*  Agent Redd explained that there were five arrest warrants that were being executed
13   simultaneously at different locations.  *Id.*  As such, "to make sure that one person isn't
14   arrested away from a house or at a certain time and the other four find out and decide to
15   attempt to elude the police, everybody is at one spot and can be arrested at the same time."
16   *Id.*  He also explained that it was safer to conduct the arrest at the defendant's residence as
17   opposed to when she was in a vehicle because "the public is more in play" given the
18   defendant's "potentially violent history" and the charges.  *Id.*

19           The plan to execute the arrest warrant was that at 5:00 a.m., agents would move
20   quietly into place and "set up an entry team on the front, a containment team on the sides
21   or back of the structure, to ensure nobody could leave or come into the structure once
22   [agents] started the operation."  *Id.* at 12.   Once everyone was in place, agents would start
23   their "knock and announce" at the front door.  *Id.*  Agent Redd explained that they had an
24   armored vehicle, called a BearCat, in the front of the residence.   *Id.*  Once the knock and
25   announce process started, the red and blue lights on the BearCat would be turned on so
26   there was no confusion that police were outside, and police presence would be announced
27   using the BearCat's "PA system."  *Id.* at 12-13.   If the door was answered, then the suspects
28   would be brought outside and agents would enter "the structure to clear the residence."  *Id.*

at 13.  If the door was not answered, the plan was to "breach the front door, conduct a limited penetration, which is basically moving into the first room or so of the house, and then slowing down and calling occupants to us, debriefing the occupants, and then methodically clearing the rest of the structure." *Id.*

Agent Redd explained that the plan to start at 5:00 a.m. stemmed from the fact that sunrise was at around 6:00 a.m. "so darkness is a benefit to us to move in position, especially when we're dealing with potentially violent criminals." *Id.* at 13-14.  He further explained that people start to get up around 6:00 a.m. so when you are dealing with potentially violent individuals it is "safer if everybody is asleep in their beds when we start the operation than awake and can make a bad decision." *Id.* at 14.

On August 30, 2018, the day the arrest was made, Agent Redd was in the armored vehicle.  *Id.* at 15.  He received a radio call saying there was a compromise because of a camera at the front door to the residence.  *Id.*  Agent Redd explained that camera could have "pinged anybody" inside the residence and woke them up.  *Id.*  For that reason, agents started the knock and announce both at the front door and on the PA system at the same time that the agents made entry into the house.  *Id.*

After making entry into the house, agents made contact with and arrested the defendant. *Id.* at 16-17.  Agents also detained the defendant's boyfriend. *Id.* at 17.  Agents then began a protective sweep of the house.  *Id.*  Agent Redd explained that a protective sweep is a search focused on making sure no one else is in the residence or hidden threats in the residence; it is not a search for evidence.  *Id.*   The sweep includes looking in areas where a person may be able to hide.  *Id.*  Agent Redd explained that closet doors would have been opened, large things moved out of the way, and bedcovers would have been pulled back.  *Id.* at 18.   "But there would be no reason to open drawers or anything like that."  *Id.*    If the agents conducting the protective sweep "see items of concern," they would relay that information to the investigative team.  *Id.*  Once the protective sweep is completed and the structure is deemed a safe location, the SRT does a "handoff" of the scene to the investigative team.  *Id.* at 18-19.

- 5 -

1          **b.     Cross-Examination**

2          The SRT's received a verbal and written briefing from the investigating team about

3  the defendant and the pending charges prior to formulating their arrest plan.  *Id.* at 21.

4  Agent Redd conceded that the defendant does not have any convictions involving violence

5  or firearms.  *Id.* at 23-24.   Her history of violence that he described on direct examination

6  stemmed from the instant charges.  *Id.* at 23.   Agent Redd conceded that he believed that

7  firearms may be present at the defendant's residence even though she had never been

8  charged with being in possession of a firearm.  *Id.* at 25.   He explained that he was told

9  that the defendant had "access to firearms based on her criminal association with the gang

10  and the other gang member in the structure."  *Id.* at 26.

11          Agent Redd believes that an arrest warrant can be executed at any time of the day

12  or night, and that he had the authority to enter the defendant's home to arrest her because

13  he believed she was in the house.  *Id.* at 27.   Agent Redd testified that a search warrant

14  must be "executed between 6:00 a.m. and 10:00 p.m. unless otherwise noted on the sheet

15  of the warrant," but arrest warrants do not have any time limitations.  *Id.* at 27-28.   Agent

16  Redd received that legal advice from counsel for ATF.  *Id.* at 28.

17          Special Agent Katz, who is part of SRT 3, authored the operational plan to effectuate

18  the arrest.  *Id.* at 29.  Agent Redd does not recall any changes being made to that plan.  *Id.*

19  at 30.   The surveillance of the defendant's residence was done the day before the arrest.

20  *Id.*  Agents also reviewed photographs of the residence, which included the front security

21  door (which defense counsel described as a "screen door with a metal frame").  *Id.*  Neither

22  the doorbell button nor the camera can be seen in the photograph of the front door.  *Id.* at

23  31.   No mention of a camera was made at the debriefing prior to the execution of the arrest

24  warrant.  *Id.*  Agent Redd explained that a Ring camera is an Internet device that is hooked

25  up to a house through WiFi and is activated by motion or pushing a button; it starts filming

26  and sends a notification to whoever is assigned to the camera's account.  *Id.* at 32.

27          On the day of the arrest, the defendant's house was "completely surrounded" by law

28  enforcement officers who are "observing all of the openings in the house."  *Id.*  The SRT

members were dressed in tactical gear, which included helmets, armored vests, handguns, rifles, flashlights, and likely gloves and boots. *Id.* at 33-34. Agent Redd agreed that the operational plan reflects that between 15 and 17 officers would be present at the defendant's house. *Id.* at 34. The initial plan was to knock and announce to let the occupants know that the police are present and give them an opportunity to answer the door. *Id.* at 34-35. However, a decision was made because of the camera to knock, announce, and enter the house simultaneously. *Id.* at 35. The concern was protecting the officers from gunfire because the camera showed the positions of the officers outside of the house. *Id.* Agent Redd confirmed that he was in the BearCat when officers entered the house; he did not enter the house until it was cleared. *Id.* at 36. Agent Redd confirmed that the protective sweep only involved looking in areas where a person could be hiding. *Id.* at 40.

### c.    Redirect Examination

Agent Redd confirmed that the SRT was advised of the charges against the defendant and that her live-in boyfriend had been convicted of aggravated assault on an officer and a firearms offense. *Id.* at 43. Based on that information, Agent Redd believed that there was possibly going to be a firearm in the residence. *Id.* Agent Redd cannot recall the location of the camera, but it was not visible in the photo that he saw during the debriefing. *Id.* at 45. Agent Redd explained that the camera was significant because "knowing the police are outside and knowing exactly – the exact locations of the police are two different things." *Id.* at 46. He further explained that "if we're unexpectedly pinged on camera right in front of a breach point where everybody can be seen," the occupants "can engage us." *Id.* That is why the forced entry was done simultaneously with the knock and announce. *Id.*

## 2.    Special Agent Samuel Katz

### a.    Direct Examination

Special Agent Katz has been a member of ATF's SRT for about six years. *Id.* at 51-52. He started at ATF in 2010, went through the SRT school in 2014, and went full-

1    time on the SRT in 2016.  *Id.* at 52.  The SRT serves high-risk warrants where there are

2    "difficulties in breaching" and/or where "the subject's criminal histories are higher than

3    normal." *Id.*

4         The execution of the defendant's arrest was made in conjunction with the arrest of

5    other individuals around Tucson.  *Id.* at 53.   There was "an overall case briefing"

6    conducted by the investigating agents and officers the evening prior to the arrest operation.

7    *Id.*  As a result, Agent Katz was made aware that firearms may be present in the residence

8    based, in part, on the charges in the indictment – *i.e.*, a homicide, firearms offenses, and

9    drug trafficking.  *Id.* at 54.   He also received information that a live-in boyfriend was part

10   of a gang and had convictions for aggravated assault on a police officer and a firearms

11   offense.  *Id.*   Based on that information, Agent Katz felt it was "necessary to take

12   precautions that there may be a firearm in the residence." *Id.*

13        With respect to surveillance, the SRT drove by the defendant's residence, checked

14   routes of travel to make sure there are no schools or construction, and "put eyes on the

15   location ourselves just to see if anything has changed from the photos that we received."

16   *Id.* at 55-56.  The initial plan to execute the defendant's arrest was to knock on the front

17   door, announce that police were present, and give the occupants a chance to open the door.

18   *Id.* at 56.  However, the plan was "a guide" and things could change "based on realtime

19   intelligence or conditions at the scene." *Id.* at 58.

20        Agent Redd explained that the arrest operation was planned for 5:00 a.m. "due to

21   the other arrest warrants that were being served that day." *Id.*  A specific time was picked

22   so all arrests could be conducted simultaneously if possible.  *Id.*  Additionally, "it's easier

23   to get into position under the cover of darkness."  *Id.* at 60.   And it is easier and safer for

24   all involved to execute the arrest warrant when the occupants are sleeping.  *Id.*  The arrest

25   operation planned at the defendant's home was to minimize putting members of the public

26   at risk.  *Id.* at 61.

27        On the day of the arrest operation, agents approached the front door to do the knock

28   and announce procedures.  *Id.*  However, agents noticed a "Ring-type" electronic closed-

circuit camera "hidden up in the eaves of the front porch looking down on the team."  *Id.*
Because the camera compromised their position, the agents "moved to simultaneously
beginning our knock and announce as we began our breach procedures at the same time."
*Id.*  Agent Redd explained that the Ring cameras were fairly new and agents "hadn't
encountered them a lot on different homes."  *Id.* at 59.  He added that "[w]e didn't have
any idea until we got to the door that the camera was there," and "there was no means of
kind of mitigating it" like by going to a different door.  *Id.*

Shortly after the officers forcibly entered the residence, the defendant walked down
the hallway toward the officers and complied with their commands.  *Id.* at 63.   The
defendant was seated in a safe area in the dining room that had been "cleared," meaning
searched for weapons.  *Id.*  As the defendant was telling Agent Katz that her boyfriend was
in the bedroom, he walked out of the bedroom and down the hallway and was detained.  *Id.*
at 64-65.   Agents then did a protective sweep of the residence to make sure there were no
other occupants that could harm officers or the arrestees.  *Id.* at 66.   As part of the
protective sweep, officers look in areas where people can hide, like closets, under beds,
mattresses, or piles of clothing, and in large cabinetry.  *Id.*  Officers typically do not look
in small areas like drawers.  *Id.*   No small places like drawers were opened during the
protective sweep of the defendant's home.  *Id.* at 67.

The protective sweep revealed items of concern.  *Id.* Specifically, a jar of marijuana
was in plain view on a nightstand in the bedroom and a pistol was sticking out on the top
shelf of the bedroom closet.  *Id.*  Agent Katz relayed to the investigating agents and officers
where the occupants came from in the home, and what items were seen in plain view during
the protective sweep.  *Id.* at 70.   To the best of Agent Katz's knowledge, the investigative
team used that information to obtain a search warrant for the house.  *Id.*

**b.    Cross-Examination**

Agent Katz confirmed that there were four or five arrest warrants that were going
to be executed the same day.  *Id.* at 71.    The initial briefing about the case and the
defendants who were to be arrested was conducted by the case agents.  *Id.* at 72.  Agent

Katz was told about the defendant's involvement in the case, specifically that "she was part of a homicide RICO investigation." *Id.* at 73. He based his conclusion that the defendant was dangerous or violent on her "involvement in the accessory to a homicide." *Id.* at 73-74. While he could not recall the defendant's criminal history, he knew that the other occupant of the residence had a conviction for aggravated assault on a police officer. *Id.* at 74. Agent Katz explained that when he has information on other occupants of a residence, he takes that into account during the execution of an arrest warrant. *Id.* Agent Katz believed that firearms may be inside the defendant's house based on the charges and the other occupant's prior convictions. *Id.* at 75. Agent Katz conceded that the defendant did not have any convictions for firearms offenses or assaultive behavior. *Id.* at 76.

Agent Katz again testified that the arrest was planned for 5:00 a.m. because it was safer for all involved, including the occupants of the house. *Id.* Agent Katz does not believe there is any time limitation for when an arrest warrant can be executed. *Id.* at 77. Agent Katz agreed with counsel that the operational plan contemplated a "knock and announce." *Id.* at 78. But in this instance agents decided to knock and enter the house "more or less simultaneously" because of the camera which allowed the occupants of the house to see the position of the agents, which puts them at risk. *Id.* at 79-80-81. Agent Katz explained that he wants the occupants to know that police are present, but not their specific locations. *Id.* at 81. Agent Katz did not hear anything inside the house or see lights come on before agents forcibly entered the house. *Id.*

Agent Katz drove by the front of the defendant's house as part of the surveillance. *Id.* at 82. He was able to see the front door, including the metal screen door, but could not see the camera. *Id.* He explained that there is "an overhang over the front door" and he could not see the camera. *Id.* at 83. Agents did not disable the camera prior to their entry into the house. *Id.*

Agents were dressed in a dark green uniform, and had helmets, armored vests, guns, and flashlights. *Id.* at 84. They used flashlights when they entered the house because there was only some ambient lighting. *Id.* As he did on direct examination, Agent Katz again

1  described the arrest of the defendant, the protective sweep of the house, and the marijuana
2  and gun seen during the sweep.  *Id.*

3  **3.** **Special Agent Paul Parkinson**

4  Because Agent Parkinson was not at the house when the defendant was arrested, he
5  could not testify about the entry into the house, the defendant's arrest, or the protective
6  sweep.  Agent Parkinson applied for and obtained a search warrant for the house based, in
7  large part, on the information provided to him by SRT members about the gun and
8  marijuana seen during the protective sweep of the house.

9  **DISCUSSION**

10  **1.** **Suppression Is Not An Appropriate Remedy Even If The Knock-And-**
11       **Announce Rule Was Violated.**

12  The defense does not dispute that law enforcement officers may arrest a defendant
13  in his or her home pursuant to an arrest warrant.  *See Payton v. New York*, 445 U.S. 573,
14  603 (1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the
15  limited authority to enter a dwelling in which the suspect lives when there is reason to
16  believe the suspect is within."); *United States v. Gorman*, 314 F.3d 1105, 1112 (9th Cir.
17  2002) ("the 'reason to believe' standard of *Payton* . . . embodies the same standard of
18  reasonableness inherent in probable cause.").  The defense also does not challenge the
19  validity of the arrest warrant or argue that there was not a reason to believe that Borges was
20  in her home at the time law enforcement officers entered the home.  Rather, the defense
21  argues that law enforcement's failure to knock and announce their presence before they
22  forcibly entered Borges' home to effectuate her arrest violated the Fourth Amendment.

23  The government initially argued that the agents did knock and announce their
24  presence before entering the residence.  However, in light of the testimony discussed
25  above, the government now argues that exigent circumstances required law enforcement
26  officers to forcibly enter the defendant's home while simultaneously knocking and
27  announcing their presence.  The government also argues that suppression of evidence is
28  inappropriate based on a failure to knock and announce when officers are executing an

- 11 -

otherwise valid arrest warrant.

"Under 18 U.S.C. § 3109, police officers must knock, announce and be refused entry before they break into a residence." *United States v. Turner*, 926 F.2d 883, 886 (9th Cir. 1991).[3]   However, "'compliance with section 3109's requirements may be excused by exigent circumstances.'" *Hudson*, 100 F.3d at 1417 (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc)).  "A police officer's 'reasonable belief that announcement may place him or his associates in physical peril . . . constitutes exigent circumstances.'" *Turner*, 926 F.2d at 886; *see also Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) ("[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."); *Hudson*, 100 F.3d at 1417 (exigent circumstances exist if a reasonable person would believe that entry was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement officers).   "This showing is not high." *Hudson v. Michigan,* 547 U.S. 586, 590 (2006).

Even though exigent circumstances can excuse a failure to comply with the knock-and-announce rule, a court "must determine what kind of exigency it was." *United States v. Ramirez*, 91 F.3d 1297, 1301 (9th Cir. 1996).   The Ninth Circuit has held that "even a mild exigency, like knowledge that a person is dangerous, can justify immediate entry where that can be done without any physical disruption of property." *Ramirez*, 91 F.3d at 1301; *Hudson*, 100 F.3d at 1417 ("'mild exigency' is sufficient to justify simultaneous or immediate entry when entry can be accomplished without any physical destruction of property").   That is not the situation in the case at hand because law enforcement broke

---

[3] Although Section 3109 specifically references an entry based on a search warrant, this statute applies to arrest warrants as well.  *See United States v. Hudson*, 100 F.3d 1409, 1417 (9th Cir, 1996).

1   through the front door.[4]

2         "To justify physical destruction of property '[m]ore specific inferences of exigency

3   are necessary." *Ramirez*, 91 F.3d at 1301 (quoting *United States v. Becker*, 23 F.3d 1537,

4   1541 (9th Cir. 1994).   Based on the Ninth Circuit case law addressing whether exigent

5   circumstances existed to justify an unannounced forcible entry into a dwelling which

6   resulted in a destruction of property, it is unlikely that specific inferences of exigency

7   existed in the case at hand.  *See United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir.

8   2000) (exigent circumstances did not exist because there were no specific facts to suggest

9   the defendant posed a threat to officers or was armed or dangerous, and the government

10  merely relied on generalized fears about how drug dealers usually act or the weapons they

11  usually keep);  *Ramirez*, 91 F.3d at 1302 (no exigency when there was no indication that

12  an occupant of the house was armed and would resist with deadly force); *Becker*, 23 F.3d

13  at 1541 (no exigency existed because government did not point to specific information that

14  the defendant was armed or dangerous, but merely relied on the fact that a search of the

15  defendant's associates' homes revealed that they possessed guns); *United States v. Fluker*,

16  543 F.2d 709, 717 (9th Cir. 1976) (no exigent circumstances where a person in a drug

17  dealer's apartment was known to own a gun, but there was no indication that he had the

18  gun with him); *United States v. Mendonsa*, 989 F.2d 366, 370-371 (9th Cir. 1993) (no

19  exigency existed for breaking into a house after police heard a noise, even though the

20  occupant was a drug dealer who had a prior felony conviction for armed robbery); *Turner*,

21  926 F.2d at 885 (exigency existed when police knew that the defendant had a gun and heard

22  him say he kept the gun to use against the police); *United States v. Perez*, 67 F.3d 1371,

23  1384 (9th Cir. 1995) (exigency existed where defendant probably knew police were

24  present, he was probably armed and had killed before, and said if arrested "he intended to

25  'go down shooting'").[5]   However, the Court need not resolve that issue because even if

26  ───────────────
    [4] The Court notes that contrary to the defendant's contention in her Motion to Suppress,
27  the plan all along was to knock and announce the presence of law enforcement.  That plan
    changed because of the Ring camera.

28  [5] In the case at hand, law enforcement did not have information that the defendant or her
    boyfriend were armed or posed an immediate threat to officers.  The only evidence of a

the knock-and-announce rule was violated, the exclusionary rule is not an appropriate remedy.  *Hudson*, 547 U.S. at 599.

In *Hudson*, the Supreme Court noted that whereas the exclusion of evidence obtained by a warrantless search vindicates a citizen's right to privacy in his or her home, "[t]he interests protected by the knock-and-announce requirement are quite different – and do not include the shielding of potential evidence from the government's eyes." *Id*. at 593. The knock-and-announce rule protects human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident.  *Id.* at 594.  The rule also gives the resident "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Id.*   However, the knock-and-announce rule has never protected a person's interest in preventing the government from entering a dwelling to make an arrest or seeing evidence during a result of a protective sweep of a residence and obtaining a search warrant to seize evidence based on those observations.  *Id.*  As a result, even if this Court found that the agents violated the knock-and-announce rule, *Hudson* renders the exclusionary rule inapplicable.

Because the suppression of evidence is not an appropriate remedy for a violation of the knock-and-announce rule, the Court recommends that the Motion to Suppress be denied on this ground.

> **2.  Suppression Is Not Warranted Even If Federal Rule of Criminal Procedure 41 Was Violated By The Entry Into the Defendant's Home During Nighttime Hours Without Judicial Authorization.**

The defendant argues that the government's failure to comply with Fed. R. Crim. P. 41 warrants suppression of the evidence seized at her house.   Specifically, the defendant points out that Rule 41 requires that a warrant to seize a person must be executed during

---

potential threat were the instant charges against Borges and the boyfriend's prior gun and assault on a police officer offenses. But the agents did not know the circumstances surrounding those offenses or how long ago the offenses occurred.  The Court is not discounting the safety concern raised by the Ring camera.  But there was no indication the defendant or her boyfriend were alerted to law enforcement's presence (*e.g*., no lights were turned on in the house and agents did not hear noises in the house).  And, more importantly, the case law makes clear that general safety concerns are insufficient to warrant an unannounced entry into a dwelling that causes a disruption of property.

daytime hours (*i.e.*, between 6:00 a.m. and 10:00 p.m.) unless the issuing judge authorizes the execution of the warrant at some other time.   The defendant reasons that this rule was violated by the entry into the defendant's house at 5:00 a.m. because no judicial authorization for a nighttime execution of the warrant was obtained.

The government argues that Rule 41 only applies to search warrants, and not arrest warrants.  The government also argues that 21 U.S.C. § 879, which authorizes search warrants relating to drug offenses to be served at any time of the day or night, applies to the extent that this statute conflicts with Rule 41.  Thus, if Section 879 applies to arrest warrants, there was no violation of that statute.  The government also argues that even if Rule 41 applies to arrest warrants and was violated, suppression is not an appropriate remedy.

The Court first notes that defense has not cited to, and this Court has not found, a case that applies the requirements of Rule 41 or 18 U.S.C. § 879 to arrest warrants.  As such, the Court is operating in a precedential vacuum on this point.   But, as discussed above, what is clear is that law enforcement officers may arrest a defendant in his or her home pursuant to an arrest warrant.   *See Payton*, 445 U.S. at 603.  Similarly, law enforcement officers can clearly arrest a person in a public place at any time pursuant to a warrant; for example, at 3:00 a.m. by making a vehicle stop or waiting for the arrestee to exit a convenience store.  The question that remains is whether Rule 41 restricts a law enforcement officer's ability to arrest a person "at any time" when the arrest will occur in a residence.  However, as discussed below, the Court need not answer that question because suppression of evidence is not warranted even if Rule 41 was violated by the nighttime entry into the defendant's house to effectuate her arrest.

Both Rule 41(e)(2)(A)(ii) and Section 879 address when a search warrant may or must be executed.  Rule 41(e)(2)(A)(ii) provides that a search warrant must be executed during the daytime, which is defined in Rule 41(a)(2) as between 6:00 a.m. and 10:00 p.m., "unless the judge for good cause expressly authorizes execution at another time."  Section 879 provides that "[a] search warrant relating to offenses involving controlled substances

1   may be served at any time of the day or night if the judge or United States magistrate judge

2   issuing the warrant is satisfied that there is probable cause to believe that grounds exist for

3   the warrant and for its service at such time."   18 U.S.C. § 879.

4          Several circuits have held that 21 U.S.C. § 879, and not Rule 41, governs the time

5   frame when a search warrant may be executed when the offense involves controlled

6   substances.  *See United States v. Rizzi*, 434 F.3d 669, 674 (4th Cir. 2006); *United States v.*

7   *Tucker*, 313 F.3d 1259, 1264 (10th Cir. 2002); *United States v. Burch*, 156 F.3d 1315, 1325

8   (D.C. Cir. 1998); *United States v. Keene*, 915 F.2d 1164, 1168 (8th Cir. 1990).[6]   As a

9   result, these courts have concluded that a search warrant pertaining to controlled substance

10  offenses can be executed at any time without express authorization from the issuing judge

11  for a nighttime entry and search.  Thus, if Section 879 is read to apply to arrest warrants,

12  then the nighttime execution of the arrest warrant here was lawful, even without express

13  judicial authorization, because the defendant is charged with drug offenses.

14         Conversely, if Rule 41(e)(2)(A)(ii) is read to apply to arrest warrants, then that rule

15  was violated because no nighttime authorization was obtained from the judge who issued

16  the arrest warrant.  However, even if the nighttime entry into the defendant's residence

17  violated Rule 41, noncompliance with this rule requires suppression only when: "(1) there

18  was 'prejudice' in the sense that the search might not have occurred or would not have

19  been so abrasive if the rule had been followed, or (2) there is evidence of intentional and

20  deliberate disregard of a provision in the Rule."  *United States v. Stefanson*, 648 F.2d 1231,

21  1235 (9th Cir. 1981); *see also United States v. Hector*, 474 F.3d 1150, 1155 (9th Cir. 2007).

22         Here, there is certainly no evidence that law enforcement intentionally and

23  deliberately disregarded Rule 41(e)(2)(A)(ii), given that it is not clear to this Court that this

24  rule even applies to arrest warrants.  There was also no prejudice because the entry into the

25  defendant's home to execute the arrest warrant and conduct the protective sweep would

---

26  [6] These circuit courts rely on *Gooding v. United States*, 416 U.S. 430 (1974), where the

27  Supreme Court held that Section 879's specific rules relating to drug offenses applied over
    the more general rules governing search warrants under Rule 41.  Even though the pertinent
    provision in Rule 41 was amended after *Gooding* was decided, these circuit courts held the

28  Supreme Court's interpretation of the interplay between Section 879 and Rule 41 still
    applies.

1    simply have occurred an hour later at 6:00 a.m.  At most, the defendant may have been

2    awake and clothed at 6:00 a.m.   But, even if that were true, that fact alone does not make

3    the entry into the home at 5:00 a.m. and the subsequent arrest and protective sweep so

4    abrasive as to require suppression of evidence later seized pursuant to a search warrant that

5    the defendant has not challenged.[7]

6            To summarize, if 18 U.S.C. § 879 applies to arrest warrants, that statute was not

7    violated even though nighttime authorization for the execution of the warrant was not

8    obtained because the defendant is charged with drug offenses.  If Rule 41 applies to arrest

9    warrants and was violated, suppression is not warranted because the defendant was not

10   prejudiced by the violation and law enforcement did not intentionally and deliberately

11   disregard this rule.

12

13                                        **<u>CONCLUSION</u>**

14

15           For the reasons detailed above, the Court recommends that the District Court deny

16   the Motion to Suppress the evidence seized pursuant to the search warrant and the

17   defendant's post-arrest statements as fruit of the poisonous tree.

18           Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and

19   file written objections within 14 days of being served with a copy of this Report and

20   Recommendation. A party may respond to the other party's objections within fourteen

21   days. No reply brief shall be filed on objections unless leave is granted by the district court.

22   If any objections are filed, this action should be designated case number: **CR 18-01695-**

23   **TUC-JAS**.  Failure to timely file objections to any factual or legal determination of the

24   Magistrate Judge may be considered a waiver of a party's right to de novo consideration

25   of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en

26

27   _____
     [7] The defense also argues that the protective sweep of her home was done for the purposes
28   of obtaining evidence.  The testimony does not support that argument and the law is clear
     that while making an in-home arrest pursuant to a valid arrest warrant, the police are
     permitted to make a limited protective sweep to ensure their safety and the safety of the
     occupants. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990).

banc).

Dated this 2nd day of June, 2022.

Eric J. Markovich
United States Magistrate Judge